**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**TONYA CURTIS,**
o/b/o **B.C.,**

                          **Plaintiff,**                    **5:11-cv-1001**
                                                            **(GLS)**

              **v.**

**CAROLYN W. COLVIN,**
Acting Commissioner of Social
Security,

                          **Defendant.**

_____

**APPEARANCES:**                          **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Olinsky Law Group                          KAREN S. SOUTHWICK, ESQ.
300 S. State Street
5th Floor, Suite 520
Syracuse, NY 13202

Legal Aid Society of                       MICHAEL J. TELFER, ESQ.
Northeast New York
55 Colvin Avenue
Albany, NY 12206

**FOR THE DEFENDANT:**
HON. RICHARD S. HARTUNIAN                  MICHELLE L. CHRIST
United States Attorney                     Special Assistant U.S. Attorney
100 South Clinton Street
Syracuse, NY 13261

Steven P. Conte
Regional Chief Counsel
Social Security Administration

Office of General Counsel, Region II
26 Federal Plaza, Room 3904
New York, NY 10278

**Gary L. Sharpe**
**Chief Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiff Tonya Curtis o/b/o B.C., challenges the Commissioner of

Social Security's denial of Supplemental Security Income (SSI), seeking

judicial review under 42 U.S.C. §§ 405(g) and 1383(c)(3). (*See* Compl.,

Dkt. No. 1.) After reviewing the administrative record and carefully

considering the arguments, the court affirms the Commissioner's decision

and dismisses the Complaint.

## II. Background

On May 26, 2009, Curtis protectively filed an application for SSI

under the Social Security Act ("Act") on behalf of her son, a minor, alleging

disability since January 29, 2009. (*See* Tr.[1] at 70, 151-53.) After her

application was denied, Curtis requested a hearing before an

Administrative Law Judge (ALJ), which was held on December 1, 2010.

_____

[1] Page references preceded by "Tr." refer to the Administrative Transcript in this case. (*See* Dkt. No. 10.)

(*See id.* at 35-69, 71-76, 80-82.) On January 13, 2011, the ALJ issued a decision denying the benefits requested, which became the Commissioner's final decision upon the Social Security Administration Appeals Council's denial of review. (*See id.* at 1-4, 17-34.)

Curtis commenced the present action by filing a Complaint on August 22, 2011, seeking review of the Commissioner's determination. (*See* Compl.) The Commissioner filed an answer and a certified copy of the administrative transcript. (*See* Dkt. Nos. 9, 10.) Both parties, seeking judgment on the pleadings, filed briefs. (*See* Dkt. Nos. 16, 19.)

## III. **Contentions**

Curtis contends that the Commissioner's decision is not supported by substantial evidence and was arrived at through the application of incorrect legal standards. (*See* Dkt. No. 16 at 10-25.) Specifically, she claims that: (1) the Appeals Council failed to properly weigh new and material evidence; (2) the ALJ improperly assessed certain opinion evidence; (3) the ALJ's credibility assessment is unsupported by substantial evidence; and (4) the ALJ erred in finding that B.C.'s impairments did not functionally equal a listed impairment. (*See id.*) The Commissioner counters that the appropriate legal standards were applied by the ALJ, and her decision is

supported by substantial evidence.  (*See* Dkt. No. 19 at 6-22.)

## IV.  <u>Facts</u>

The evidence in this case is undisputed and the court adopts the parties' factual recitations.  (*See* Dkt. No. 16 at 2-8; Dkt. No. 19 at 2.)

## V.  <u>Standard of Review</u>

The standard for reviewing the Commissioner's final decision under 42 U.S.C. § 1383(c)(3) is well established and will not be repeated here. For a full discussion of the standard of review, the court refers the parties to its previous opinion in *Christiana v. Comm'r of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008). Similarly, for a full discussion of the three-step analysis used by the Social Security Administration to determine whether individuals under the age of eighteen are disabled, the court refers the parties to its previous opinion in *Shatraw ex rel. K.C.Y., III, v. Astrue*, 7:11-cv-13, 2012 WL 589667, at *1 (N.D.N.Y. Feb. 22, 2012).

## VI.  <u>Discussion</u>

### A.    <u>New Evidence</u>

Curtis argues first that the Appeals Council erred by failing to remand based on evidence submitted to it after the ALJ's decision.  (*See* Dkt. No.

16 at 10-12.)  Specifically, Curtis submitted the opinion of Carol Fatti-Barrigar, a therapist who saw B.C. twice a week for one hour while he attended pre-school.  (*See id.*; Tr. at 473-76.)  The Commissioner counters, and the court agrees, that the Appeals Council properly considered this evidence, and found no basis to disturb the ALJ's decision. (*See* Dkt. No. 19 at 18-19.)

The Appeals Council shall consider "new and material" evidence if it "relates to the period on or before the date of the [ALJ] hearing decision." 20 C.F.R. § 416.1476(b)(1); *see Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996).  The Appeals Council "will then review the case if it finds that the [ALJ]'s action, findings, or conclusion is contrary to the weight of the evidence currently of record."  20 C.F.R. § 416.1470(b).  However, even if "the Appeals Council denies review after considering new evidence, the [Commissioner]'s final decision necessarily includes the Appeals Council's conclusion that the ALJ's findings remained correct despite the new evidence."  *Perez*, 77 F.3d at 45 (internal quotation marks and citation omitted).  Accordingly, the additional evidence becomes part of the administrative record reviewed by the district court.  *Id*. at 45-46.

Here, the additional evidence Curtis submitted after the ALJ's

5

determination was noted by the Appeals Council in its denial of review. (*See* Tr. at 1-4.)  The evidence submitted by Curtis included a January 2011 Medical Source Statement from therapist Carol Fatti-Barrigar, who had treated B.C. the previous year while he attended preschool.  (*See id.* at 473-76.)  Fatti-Barrigar opined that B.C. suffered a moderate loss of ability in six categories related to acquiring and using information, and a marked loss in two categories.  (*See id.* at 473-74.)  With respect to attending and completing tasks, she opined that B.C. suffered a moderate loss of ability in two areas, a moderate to marked loss in one area, and a marked loss in three areas.  (*See id.* at 474.)  In Fatti-Barrigar's opinion, B.C. suffered a mild loss of ability in four areas of the domain interacting and relating to others, but a moderate loss of ability in five areas of the domain.  (*See id.*)  With respect to the domain moving about and manipulating objects, she opined that B.C. suffered a mild loss of ability in four areas, and a moderate loss of ability in three areas.  (*See id.* at 474-75.)  Finally, in the domain caring for self, Fatti-Barrigar opined that B.C. suffered a mild loss of ability in one area, and a moderate loss in two areas.  (*See id.* at 475.)

The court agrees with the Commissioner that the new evidence

presented to the Appeals Council provided no basis to change the ALJ's decision. (*See* Dkt. No. 19 at 18-19; Tr. at 1-2.) First, Fatti-Barrigar's opinion does not "'significantly discredit[] or undercut the ALJ's decision to deny benefits.'" *Knight v. Astrue*, No. 10 Civ. 5301, 2011 WL 4073603, at *13 (E.D.N.Y. Sept. 13, 2011) (quoting *Fernandez v. Apfel*, CIV. A. CV-977532DGT, 1999 WL 1129056, at *4 (E.D.N.Y. Oct. 4, 1999)). Moreover, the ALJ had before her Fatti-Barrigar's treatment notes, which she explicitly relied on in making her determination. (*See* Tr. at 28, 311-12.) On June 15, 2009, Fatti-Barrigar completed a progress report and noted that B.C. was "doing a great job following his preschool routines with little redirection[,] able to follow [two-]step directions[,] improving on color recognition[, and] improving in his ability to stay on task with activities surrounding color recognition." (Tr. at 311.) She further noted that B.C. was "doing well with letter and number recognition[,] able to complete puzzles, match numbers to set [one to ten], and verbal directions with little assistance. Socially, [B.C. was] caring and considerate to his peers [and] engage[d] in turn taking, sharing and cooperative play." (*Id.*) As the ALJ had before her Fatti-Barrigar's treatment notes, which support the ALJ's functional equivalency analysis, as well as the opinions of B.C.'s preschool

7

and kindergarten teachers, treating psychiatrist, consultative examiners, and a state agency medical consultant, her January 2011 opinion does not add so much to the record as to displace the substantial evidence supporting the ALJ's determination. (*See id.* at 180-95, 231-38, 311-12, 410-13.)

## B.    <u>Weighing Opinion Evidence</u>

Next, Curtis contends that the ALJ improperly assessed certain opinions of record. (*See* Dkt. No. 16 at 12-20.) Specifically, she argues that the ALJ failed to consider the appropriate factors in evaluating the opinion of treating psychiatrist James Demer, and wholly failed to weigh the opinions of B.C.'s teachers, school nurse, and speech pathologist. (*See id.*) The Commissioner counters that the ALJ "properly weighed the evidence of record." (Dkt. No. 19 at 19-21.) The court agrees with the Commissioner.

### 1.    *Treating Physician*

Curtis argues that the ALJ failed to weigh Dr. Demer's specialty, the length of Dr. Demer's treating relationship with B.C., and his frequency of examination. (*See* Dkt. No. 16 at 14.) Further, Curtis contends that the evidence of record supports Dr. Demer's opinion. (*See id.* at 14-17.)

Controlling weight will be given to a treating source's opinion on the nature and severity of a claimant's impairments where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 416.927(c)(2); *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). When a treating source's opinion is given less than controlling weight, the ALJ is required to consider the following factors: the length, nature and extent of the treatment relationship; the frequency of examination; evidentiary support offered; consistency with the record as a whole; and specialization of the examiner. 20 C.F.R. § 416.927(c)(2)-(6).

Here, the ALJ explained that she gave "probative weight" to the conclusions of the state agency medical consultants, but "no weight" to the November 2010 medical source statement of Dr. Demer and child therapist Robin Chima based on the evidence of record, including the treatment notes of Dr. Demer and Chima. (Tr. at 26.) The ALJ highlighted the fact that Dr. Demer's treatment notes stated that B.C. was responding favorably to his medication and was doing well in school. (*See id.* at 26, 426-29.) Further, the ALJ noted that the narrative portion of the opinion did not support a finding of disability, but rather indicated that B.C.'s speech

delay, Attention Deficit Hyperactivity Disorder (ADHD) symptoms, and "oppositional tendencies" were improving with medication and therapy.  (*Id.* at 26; *see id.* at 410, 413.)

In addition to the above reasoning, the ALJ explicitly referenced 20 C.F.R. § 416.927 as well as relevant Social Security Rulings.  (*See id*. at 25.)  Curtis argues that the ALJ failed to properly consider the specialization of the physicians in weighing their opinions.  (*See* Dkt. No. 16 at 14); 20 C.F.R. § 416.927(c)(5).  However, Dr. Demer and medical consultant R. Baum both practice relevant specialties, and the ALJ explicitly acknowledged that Dr. Demer is B.C.'s treating psychiatrist.  (*See* Tr. at 23.)  Ultimately, as it is clear that she properly applied section 416.927(c), the ALJ did not err in failing to methodically discuss each individual factor, and her assessment of the opinion of Dr. Demer and Chima is legally sound.  *See* SSR 06-03p, 71 Fed. Reg. 45,593, 45,596 (Aug. 9, 2006) ("Not every factor for weighing opinion evidence will apply in every case.").

Curtis' argument that the ALJ's decision to discount the assessment of Dr. Demer and Chima is not supported by substantial evidence is similarly unavailing.  As explained by the ALJ, Dr. Demer's treatment notes

do not support a finding of disability, but, rather, indicate that B.C. responded well to treatment. (*See* Tr. at 26.) In April 2010, Dr. Demer noted that Curtis reported an improvement in B.C., as he was listening better, was more attentive, and was doing well in school. (*See id.* at 428-29.) In May 2010, Dr. Demer again noted that B.C. was responding well to his medication, and, although his parents separation was a source of stress, B.C. was handling it fairly well. (*See id.* at 426-27.) The additional treatment notes Curtis provided to the Appeals Council also support the ALJ's decision. (*See id.* at 446-54.) In June 2010, it was noted that B.C. was less hyperactive and less impulsive, however, Curtis reported that B.C.'s medication was wearing off in the afternoons and, thus, Dr. Demer adjusted his prescription. (*See id.* at 453-54.) In July 2010, B.C. was "doing quite well," more cooperative, and less irritable. (*Id.* at 450-51.) In August 2010, Curtis stated that B.C. was "terrific," and in October 2010, reports from B.C.'s school were positive, although B.C.'s father reported that there was "significant discord" between himself and Curtis, and Curtis complained that B.C. had been a lot more oppositional. (*Id.* at 446-47, 449.) In addition to Dr. Demer's own treating notes, the notes and opinion of Fatti-Barrigar and the opinion of Dr. Baum are inconsistent with Dr.

Demer's medical source statement.  (*See id.* at 392-99, 311-12, 473-76.);

*Baszto v. Astrue*, 700 F. Supp. 2d 242, 249 (N.D.N.Y. 2010) ("[A]n ALJ is

entitled to rely upon the opinions of both examining and non-examining

State agency medical consultants, since such consultants are deemed to

be qualified experts in the field of social security disability.").

In sum, the ALJ provided sufficient reasons for discounting Dr.

Demer's opinion, and her decision to do so is supported by substantial

evidence.

### 2.    Other Sources

Curtis also argues that the ALJ failed to weigh the June and August

2009 opinions of B.C.'s preschool teachers, and the April 2010 opinion of

B.C.'s kindergarten teacher, school nurse and speech therapist.  (*See* Dkt.

No. 16 at 17-20.)  Under the regulations, educational personnel, such as

teachers, are considered "other sources."  SSR 06-03p, 71 Fed. Reg. at

45,594 (citing 20 C.F.R. § 416.913(d)).  Opinions offered by teachers

"should be evaluated by using the [20 C.F.R. § 416.927] factors," although

"[n]ot every factor . . . will apply in every case."  *Id*. at 45,595.

Here, in June 2009, B.C.'s preschool teacher and teaching assistant

completed a questionnaire and noted that B.C. was receiving special

education services two hours a week, physical therapy thirty minutes a week, and speech therapy one hour a week. (*See* Tr. at 180-87.) In their opinion, B.C. had slight or obvious limitations in several subsets of the domains acquiring and using information, attending and completing tasks, interacting and relating with others, and moving about and manipulating objects. (*See id.* at 181-84.) They also opined that B.C. suffered serious problems in two subsets of the domain caring for one's self. (*See id.* at 185.) In August 2009, B.C.'s preschool teachers completed a second questionnaire and again reported that he was receiving two hours of special education a week. (*See id.* at 188-95.) At this time, they opined that B.C. suffered slight or obvious problems in the domains moving about and manipulating objects and caring for one's self. (*See id.* at 192-93.) Further, B.C. suffered serious problems in three out of ten areas related to acquiring and using information, two out of thirteen areas related to attending and completing tasks, and one out of thirteen areas related to interacting and relating with others. (*See id.* at 189-91.) They also reported that they could understand almost all of B.C.'s speech if the topic of conversation was known or after repetition and/or rephrasing, and had not needed to implement any behavior modification strategies for him.

(*See id.* at 191-92.)

In April 2010, B.C.'s kindergarten teacher, school nurse, and speech therapist reported that B.C. was performing below grade level in reading, math, and writing. (*See id.* at 231.) He was receiving extra help with reading five times a week, physical therapy once a week, occupational therapy twice a week, and speech therapy four times a week. (*See id.*) In their opinion, B.C. suffered slight and obvious problems in various activities relating to moving about and manipulating objects and caring for himself. (*See id.* at 235-36.) They opined that B.C. suffered serious problems in eight out of ten activities related to acquiring and using information, three out of thirteen activities related to attending and completing tasks, and four out of thirteen activities related to interacting and relating to others. (*See id.* at 232-34.) They also reported that it had not been necessary to implement behavior modification strategies for B.C., explaining that he can usually be redirected with an adult reminder. (*See id.* at 234.)

Curtis is correct that, an ALJ should explain the weight assigned to opinions from "'other sources' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ]'s reasoning." SSR 06-03p, 71

Fed. Reg. at 45,496.  Here, the ALJ clearly considered the opinions of B.C.'s teachers and school professionals, although it may not be as clear what weight he assigned them.  (*See* Tr. at 28-33.)  The ALJ's functional equivalency analysis is replete with references to the opinions.  (*See id.*) For example, the ALJ noted B.C.'s teachers' opinions with respect to his ability to acquire and use information, but concluded that the evidence of record demonstrated an improvement in B.C.'s academic and language skills immediately after the commencement of support services.  (*See id.* at 28.)  Accordingly, despite the lack of specific weight assigned to the opinions, the court is able to discern with ease the ALJ's reasoning, and his treatment of that evidence will not be disturbed.

## C.  Credibility

Curtis also contends that remand is required because the ALJ failed to evaluate her testimony, or the testimony of B.C., using the factors required by 20 C.F.R. § 416.929(c).  (*See* Dkt. No. 16 at 20-21.)  Further, Curtis faults the ALJ for failing to explicitly note certain portions of her testimony.  (*See id.* at 21.)  The court does not agree.

Under the regulations, parents are considered "other sources," and, while their opinions cannot "establish the existence of a medically

determinable impairment," they may be used as a means of providing insight into a child's degree of impairment and functional ability. SSR 06-03p, 71 Fed. Reg. at 45,494. (citing 20 C.F.R. § 416.913(d)). Again the court notes that an ALJ should generally "explain the weight given to the opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence . . . allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." *Id.* at 45,596.

Here, although she did not assign specific weight to Curtis' testimony, the ALJ's evidentiary discussion and functional equivalency analysis are replete with references, both direct and indirect, to her allegations. (*See* Tr. at 23-34.) For example, in making her determination with respect to the domain acquiring and using information, the ALJ acknowledged Curtis' statements with respect to B.C.'s delays in the acquisition of "readiness skills," but determined that the weight of the evidence did not support a finding of a marked impairment in that domain. (*Id.* at 28.) In addition, the ALJ noted that, with respect to the domain interacting and relating to others, although Curtis testified that B.C.'s medication wore off by the time he returned home from school, she also acknowledged that she and B.C. got along pretty well, and his impairments

did not limit his ability to play with children outside of school.  (*See id.* at 31.)  With respect to the domain health and physical well being, the ALJ explained that B.C.'s alleged issues with seasonal allergies and asthma did not require him to see his pediatrician frequently, let alone go the hospital. (*See id.* at 34.)  Ultimately, the court is able to easily discern the ALJ's reasoning, and her treatment of Curtis' testimony will, therefore, not be disturbed.

## D.    Functional Domains

Finally, Curtis argues that the ALJ erred in failing to find that B.C. suffers marked limitations[2] in four of six functional domains.  (*See* Dkt. No. 16 at 21-25.)  The Commissioner contends, and the court agrees, that substantial evidence supports the ALJ's finding of less than marked limitations in each of the domains in question.  (*See* Dkt. No. 19 at 7-15.)

### 1.    *Acquiring and Using Information*

This domain concerns how well the child acquires or learns information, and how well the child uses the information that he has learned.  *See* 20 C.F.R. § 416.926a(g).  Preschool children "should begin

---

[2] A "marked" limitation is one that "interferes seriously" with the claimant's "ability to independently initiate, sustain, or complete activities" within the given domain.  20 C.F.R. § 416.926a(e)(2)(i).

to learn and use the skills that will help [them] to read and write and do arithmetic when [they] are older." *Id*. § 416.926a(g)(2)(iii). Relying on B.C.'s scores on intelligence testing, an independent examination by an approved speech pathologist, and the contents of B.C.'s current Individualized Education Program (IEP), the ALJ concluded that B.C. had a less than marked limitation in this domain. (*See* Tr. at 27-28.) According to Curtis, the opinions of B.C.'s teachers, and other school personnel, as well as Dr. Demer and Chima, support a finding of a marked limitation in this domain. (*See* Dkt. No. 16 at 21-22.)

As the ALJ pointed out, intelligence testing conducted in January 2009 indicated that B.C.'s intelligence was in the low average range. (*See* Tr. at 28, 199.) Further, B.C. attended general education classes with special education support, was not required to repeat preschool or kindergarten, and was not exempted from state and local tests administered to general education students. (*See id.* at 28, 374, 419-21.) A November 2009 IEP progress report showed that B.C. had made progress towards his academic and language goals, including sorting colors, and understanding the concepts of short, tall, top, bottom, and middle. (*See id.* at 401-05.) In addition, his kindergarten teacher reported

that B.C. could identify seven out of eight color names, twenty-seven out of twenty-seven body parts, six out of six basic shapes, and numerals zero to five.  (*See id.* at  401-07.)  Language pathologist Patricia Munski conducted a consultative speech and language evaluation and concluded that B.C. could understand and follow simple directions, and adequately express his wants and needs.  (*See id.* at 384-87.)  According to Munski, B.C.'s vocal quality and fluency skills were within normal limits and he had mild delays in his receptive and expressive language.  (*See id.* at 386-87.)  Finally, after reviewing the evidence of record, Dr. Baum opined that B.C. suffered a less than marked limitation in the domain acquiring and using information.  (*See id.* at 396.)

Ultimately, the ALJ's finding that B.C. suffered less than a marked limitation in his ability to acquire and use information is supported by substantial evidence.

### 2.    Attending and Completing Tasks

This domain contemplates a child's ability to focus and maintain attention, "begin, carry through, and finish . . . activities, including the pace at which [the child] perform[s] activities and the ease with which [he] change[s] them."  20 C.F.R. § 416.926a(h).  Preschool children "should be

able to pay attention when [they] are spoken to directly, sustain attention to [their] play and learning activities, and concentrate on activities like putting puzzles together or completing art projects." *Id*. § 416.926a(h)(2)(iii). Children of B.C.'s age should also be able to focus long enough to dress and feed themselves and put away their toys, as well as wait their turn and change their activity when told to do so by a caregiver. *See id*. § 416.926a(h)(2)(iii).

The ALJ found that, due to his progress after being placed on an appropriate medication regimen for ADHD, B.C. did not suffer a marked limitation in this domain. (*See* Tr. at 29-30, 426-29, 446-47, 449-51, 453-54.) In B.C.'s November 2009 IEP progress report, it was noted that he "demonstrate[d] age appropriate behaviors on a regular basis[, including] follow[ing] directions without much hesitation or resistance[, and] follow[ing] classroom routines, often without prompting or redirection." (*Id.* at 403.) During his speech and language consultative examination, it was observed that B.C. was cooperative and displayed adequate attention and concentration, and on his psychiatric consultative examination, B.C.'s attention and concentration were intact. (*See id.* at 384, 390.) Finally, even Curtis admitted that B.C. was well behaved at school due to his

medication.  (*See id*. at 55.)

Based on the foregoing, the ALJ's ultimate conclusion that B.C. suffers less than a marked limitation in this domain is supported by substantial evidence and will not be disturbed.

> 3.    *Interacting and Relating with Others*

In considering this domain, the Commissioner assesses a claimant's ability to "initiate and sustain emotional connections with others, develop and use the language of [his] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others."  20 C.F.R. § 416.926a(i).  Preschool children "should begin to prefer playmates . . . and start to develop friendships with children" of their own age, "use words instead of actions," and "be better able to share, show affection, and offer to help."  *Id*. § 416.926a(i)(2)(iii).  In addition, they "should be able to initiate and participate in conversations, using increasingly complex vocabulary and grammar, and speaking clearly enough that both familiar and unfamiliar listeners can understand [them] most of the time."  *Id.*

Here, the ALJ's determination, that B.C. has a less than marked limitation in his ability to interact and relate with others, is supported by

substantial evidence.  (*See* Tr. at 30-31.)  It is undisputed that B.C.'s interactions with other children is not always socially appropriate, including his attempts to sit or stand too close to others.  (*See id.* at 30, 43, 403.)  However, Curtis testified that everyone at school loves B.C. and she gets along pretty well with B.C., despite the fact that he talks back to her.  (*See id.* at 54.)  B.C.'s kindergarten teacher reported that he was a pleasure to have in class, always happy, and willing to please.  (*See id.* at 407.)  She further noted that B.C. shows respect and courtesy to adults and peers, works well with other, and takes turns and shares.  (*See id.* at 408.)

Although the record indicates that B.C. has experienced some behavioral issues, the ALJ's determination that he suffers less than marked limitation in this domain is supported by substantial evidence.

### 4.    *Moving About and Manipulating Objects*

This domain contemplates a claimant's ability to "move his body from one place to another," as well as "move and manipulate things."  20 C.F.R. § 416.926a(j).  Preschool children "should be able to walk and run with ease [and] climb stairs and playground equipment with little supervision." *Id.* § 416.926a(j)(2)(iii).  Further, their fine motor skill should be developing, allowing them to "complete puzzles easily, string beads, and build with an

assortment of blocks," as well as "show[] increasing control of crayons, markers, and small pieces in board games, . . . cut with scissors independently[,] and manipulate buttons and other fasteners."  *Id.*

The ALJ found that B.C. has less than marked limitation in this domain because of his improvement with physical and occupational therapy.  (*See* Tr. at 32.)  The ALJ noted that Curtis testified that B.C. no longer suffered limitations in his ability to walk, run, or jump.  (*See id.* at 32, 47.)  Notably, on his most recent IEP, B.C. was discharged from physical therapy, as he had greatly improved his strength and endurance over the previous year, and he was assigned to the general physical education program.  (*See id.* at 420, 422.)  It was noted that B.C. had made "significant improvement with fine motor activities," and was in the average range of gross motor development.  (*Id.* at 422.)

Accordingly, while some evidence exists of problems within this domain, the ALJ's conclusion that B.C. suffers less than a marked limitation is supported by substantial evidence.

## E.    Remaining Findings and Conclusions

After careful review of the record, the court affirms the remainder of the ALJ's decision as it is supported by substantial evidence.

## VII. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **AFFIRMED** and

Curtis' Complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case and provide a copy of this

Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

July 2, 2013
Albany, New York

Gary L. Sharpe
Chief Judge
U.S. District Court